UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT



| | |
|---|---|
| ANTONY J. SUTTON, in his capacity as a Limited Partner of Jay Peak Hotel Suites LP, And John Doe in his capacity as a Limited Partner of Jay Peak Hotel Suites Phase II LP, Plaintiffs, v. SAINT-SAUVEUR VALLEY RESORTS, INC. Defendant | Civil Action No. 2:17-cv-61 |

## VERIFIED COMPLAINT

This is a derivative action related to Jay Peak Ski Area located in Jay, Vermont, It is filed on behalf of limited partners of Jay Peak Hotel Suites LP and Jay Peak Hotel Suites Phase II LP, pursuant to 11 V.S.A § 3491, against Saint-Sauveur Valley Resorts, Inc. ("SSVR"), a Canadian corporation, which formerly owned the Jay Peak Ski Area.

The claim arises as the result of the filing by the Securities Exchange Commission of a civil enforcement action in the U.S. District Court for the District of South Florida, and known as Civil Action No. CV2016:21301 ("SEC Action"), alleging fraud and other illegal conduct perpetrated by various individual defendants in that action, including Ariel Quiros ("Quiros"). Quiros was the owner of the Jay Peak Ski Resort located in Jay, Vermont ("Jay Peak"). SSVR was the former owner of the resort and sold the assets of Jay Peak to Quiros in June, 2008.

The Plaintiffs are respectively limited partners of two Vermont limited partnerships, known as Jay Peak Hotel Suites LP ("Phase I"), and Jay Peak Hotel Suites Phase II LP ("Phase

II"), both organized by SSVR in order to further develop the Resort. The limited partnerships were both named as Defendants in the SEC Action, and presently are under the control and supervision of Michael I. Goldberg, Esq., the Court appointed Receiver in the SEC Action ("Receiver").

Plaintiffs, through their Counsel, have made written demand that the Receiver commence this action in his capacity as Receiver for the limited partnerships, but he has failed and refused to do so. Plaintiffs therefore bring this derivative action to preserve their legal rights pursuant to Vermont Statute, specifically 11 V.S.A § 3491.

Plaintiffs herein allege that SSVR aided and abetted the fraudulent scheme with knowledge of the improper and illegal nature of its actions, and thereby took receipt of funds in excess of $23 Million tendered by Quiros as part of payment for the purchase of Jay Peak, which it knew to be the property of others, and funds for which it had fiduciary obligations.

## INTRODUCTION

**A. The Purchase of Jay Peak using Investor Funds**

The fraud giving rise to the SEC action began with Quiros' purchase of the Jay Peak Resort ("Resort") in June, 2008. At the time, William Stenger ("Stenger") was the longstanding President and CEO of Jay Peak, and also separately represented the general partner of two EB-5 limited partnerships, known as Jay Peak Hotel Suites LP ("Phase I"), and Jay Peak Hotel Suites II LP ("Phase II"), both organized by SSVR in order to further develop the Resort.

Documentary evidence demonstrates that just prior to the closing on the stock transfer, selling the resort to Quiros, Stenger, acting in his capacity as general partner of the two limited

partnerships, transferred the sum of $21.9 million of escrowed Phase I and II investor funds, to the direct custody and control of Quiros, which Quiros then used to purchase the Resort.

As general partner, Stenger oversaw the Phase I and Phase II limited partnerships. Phase I raised $17.5 million from 35 investors from December, 2006 through May 2008. Phase II raised $7.5 million from 15 investors between March and June 2008, and another $7.5 million from 15 investors from July through September 2008.

SSVR, apparently anxious to sell Jay Peak, had sought out Quiros, a long time visitor to the resort, and commenced negotiations for him to purchase the resort (which included a hotel, golf course, skiing operations and realestate but not the Phase I and Phase II limited partnerships). From January through June 2008, Quiros negotiated and finalized a stock transfer between SSVR and a newly formed company, Q Resorts, Inc.

During this time, holding a deposit of only $350,000 (less than 2.5% of the cash required to effect the purchase), SSVR elected to relinquish direct control of Jay Peak to Quiros and Stenger, apparently without any written letter of intent or other agreement, and without Quiros providing any demonstration that he had the resources to effect such a purchase.

SSVR and Q Resorts signed the stock transfer agreement on June 13, 2008, which resulted in a closing 10 days later, on June 23, 2008. The purchase price was $25.7 million, $8.5 million of which was assumed debt.

Prior to and in preparation for the closing with SSVR, Stenger, acting for SSVR, opened brokerage accounts at a Miami area office of Raymond James & Associates, Inc. ("Raymond James"), managed by Quiiros' former son-in-law, Joel Burstein. Stenger opened an account in the name of Phase I on May 20, 2008, and a second account in the name of - Phase II, one month later on June 20, 2008.

On June 16 and 17, 2008, Stenger, acting for SSVR, transferred $11 million of Phase I investor funds from an escrow account at People's United Bank ("Peoples Bank") in Vermont to a SSVR Raymond James account in Florida. Three days later, on June 20, 2008, Stenger, still acting for SSVR, transferred $7 million of Phase II investor funds from People's Bank to a SSVR Raymond James account. These transfers directly violated the express terms of the Escrow Agreements between Peoples and the EB-5 investors. Stenger then moved these funds into other Raymond James accounts not controlled by SSVR.

Simultaneously, Counsel for SSVR communicated with Burstein, with copies to Quiros, Stenger and others, suggesting that the transferred funds should not be used to effect the Jay Peak purchase (See attached Exhibits "1" and "2"). Notwithstanding these communications, it is evident that Stenger, acting on behalf of SSVR, had consciously permitted $18 million of escrowed EB-5 investor funds to be turned over to Quiros just before his acquisition of the ski resort **for no known purpose**.

Quiros' testimony at his deposition taken by the SEC on May 22, 2014 is compelling:

> *A What we made them do at the time of closing, I didn't believe that they had these funds in these accounts. I didn't believe it. Bill Stenger told me. Other men also told me. But I didn't believe it. I said the only way that I'm going to be able to believe you, you're going to have to open up your own account at Raymond James.*
>
> *Q And this is what you told MSSI?*
>
> *A So they proceeded and opened up – Louis Dufour, Louis Four (sic), Bill Stenger, at that time, Bill Stenger was still on MSSI's team, you guys open up the account at Raymond James and show me, prove to me that these funds are here. So I waited. They opened up the account at Raymond James. So I never used this account. I told them I'm not going to use this account.*

On June 23, 2008, the day of the closing, Quiros took $7.6 million, originally from the SSVR Raymond James Phase I investor account, and $6 million, originally from the SSVR

Raymond James Phase II investor account, and placed the funds in his Q Resorts, Inc. account there. He then wired $13.5 million from that account to SSVR. Stenger then closed all the limited partnership accounts at Raymond James.

The balance of $5.5 million owed to SSVR, was transferred over the next two months, the additional monies also coming from Phase II investor monies. Thus, there is no real dispute that the funds tendered to SSVR to effect the stock transfer all came from the Phase I and II investor monies and were and are fraudulently/wrongfully converted monies investor funds.

**B. The Stock Transfer Agreement between St. Sauveur and Q Resorts**

The Stock Transfer Agreement ("STA") was signed on June 13, 2008 by SSVR and Q Resorts for a closing to take place 10 days later on June 23, 2008 (See attached Exhibit "2(A)"). There was no lender involved in the transaction, and the STA indicates that Quiros was not required to provide a financial statement to SSVR, or otherwise demonstrate his source of funds to accomplish the purchase.

The 44 page agreement, with numerous schedules attached, indicates a total purchase price of $23.5 million, $15 million cash at closing, the assumption of $8.5 million of pre-existing debt and an additional adjustment of $2,512,065, which SSVR had advanced to finance operations during the 6 months prior to closing when Quiros managed the ski resort. Q Resorts received credits at closing for the deposit of $350,000, $401,000 in accrued "interest" and $301,000 for purported "profits" earned during the same 6 month period.

Several provisions of the agreement bear mentioning. Article 1 is entitled Definitions, and has two key provisions, the first being Article 1.1(q), defining "EB-5 Project" to include the Phase I and the Phase II projects, and the obligations and liabilities associated with the limited and general partnerships for both.

5

The second key definition is Article 1.1(gg), defining the term, "Knowledge of the Transferors", defined to include the knowledge, "after due inquiry of Louis Dufour ("Dufour") and Louis Herbert ("Herbert"), as well as the knowledge of William Stenger", but only to the extent that his knowledge was communicated to the others in writing prior to the execution of the agreement.

However, "knowledge of a particular fact" is when:

> (i) an individual is actually aware of such fact or other matter; or
>
> (ii) a prudent individual could reasonably be expected to discover or otherwise become aware of such fact, or other matter, in the course of conducting a reasonably comprehensive, but not exhaustive, investigation concerning the existence of such fact or other matter.

Other key provisions include Articles 3 and 4, entitled REPRESENTATIONS AND WARRANTIES, wherein the Seller, but not the Buyer was required to provide to the other party a financial statement, and Article 4.6, where the Buyer promises that it "has or will have" the funds necessary to complete the transaction on the June 23 scheduled closing date.

### C. The Declaration of Saint-Sauver Valley Resorts, Inc.

On May 20, 2015 Dufour and Hebert, on behalf of SSVR, provided to the SEC a Declaration under the pains and penalties of perjury (See attached Exhibit "3"). The document recites a short history of the Q Resorts purchase, tacitly admits that funds held by the Phase I limited partnership were transferred to the control and custody of Quiros prior to the closing, but also incorrectly suggests that the Phase II offering was outside of the purchase.

This statement is both inconsistent with the express terms of the STA, and also ignores that SSVR had solicited, escrowed, and then transferred to Quiros over $7 million of escrowed Phase I funds prior to the closing. The Declaration also fails to mention that Stenger, while still

6

employed by SSVR, had signature authority over all escrowed EB-5 monies, and acting in his dual capacities, authorized the wire transfers to Raymond James prior to the closing.

As the consequence of the conscious actions of SSVR and its principals, Quiros was able to effect the purchase of the Resort, using solely the funds of the Phase I and II Limited Partnerships. SSVR took those funds, knowing the source, and upon information and belief, as of the date of this filing still retains them. The Receiver, by this action, seeks the return of those funds to the Receivership estate.

## THE PARTIES

1. Plaintiff, Antony J. Sutton ("Sutton") has a residential address of 126 Homestead Lane, Welwyn Garden City, Hertfordshire, England ALZ 4NX, and is a limited partner of the Jay Peak Hotel Suites LP and asserts rights derivative of Michael I. Goldberg, Esq., who is the duly appointed Receiver of the Phase I limited partnership.

2. John Doe is a limited partner of the Jay Peak Hotel Suites Phase II LP with a residential address of _____. Doe asserts rights derivative of Michael I. Goldberg, Esq. who is the duly appointed Receiver of the Phase II limited partnership.

3. Michael I. Goldberg, Esq. is an attorney engaged in the practice of law at Akerman LLP, 350 East Las Olas Boulevard, Suite 1600, Fort Lauderdale, Florida 33301. Goldberg was appointed as Receiver for the Defendants and relief Defendants in the SEC Action on April 13, 2016.

4. The Defendant, SSVR, is a Canadian corporation with a business address of 350 Saint-Denis St., PQ, Canada J0R1R, and is registered as a foreign corporation with the Secretary of State of the State of Vermont. Hebert is the President and a Director, Stenger is Vice President and Dufour is a Director of SSVR.

## STANDING

5. Plaintiffs, through their Counsel, have made written demand that Goldberg commence this action in his capacity as Receiver for the Phase I and Phase II limited partnerships, but he has failed and refused to do so. Plaintiffs therefore bring this derivative action to preserve their legal rights pursuant to Vermont Statute, specifically 11 V.S.A § 3491.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this case, pursuant to 28 U.S.C. § 1332, based on complete diversity and an amount in controversy over $5,000,000.00.

7. Venue is proper under 28 U.S.C. § 1391(a)(2) because the conduct complained of primarily took place in the State of Vermont.

## THE ACTS GIVING RISE TO THE CLAIM

8. The fraud giving rise to the SEC action began with Quiros' purchase of the Jay Peak Resort ("Resort") in June 2008. At the time, William Stenger ("Stenger") was the longstanding President and CEO of Jay Peak, and also separately represented the general partner of two EB-5 limited partnerships, known as Jay Peak Hotel Suites LP ("Phase I"), and Jay Peak Hotel Suites Phase II LP ("Phase II"), both organized by SSVR in order to further develop the Resort.

9. Documentary evidence demonstrates that just prior to the closing on the stock transfer, selling the resort to Quiros, Stenger, acting in his capacity as general partner of the two limited partnerships, transferred the sum of $21.9 million of escrowed Phase I and II

investor funds, to the direct custody and control of Quiros, which Quiros then used to purchase the Resort.

10. As general partner, Stenger oversaw the Phase I and Phase II limited partnerships. Phase I raised $17.5 million from 35 investors from December, 2006 through May 2008. Phase II raised $7.5 million from 15 investors between March and June 2008, and another $7.5 million from 15 investors from July through September 2008.

11. SSVR, apparently anxious to sell Jay Peak, had sought out Quiros, a long time visitor to the resort, and commenced negotiations for him to purchase the resort. From January through June 2008, Quiros negotiated and finalized a stock transfer between SSVR and a newly formed company, Q Resorts, Inc.

12. During this time, holding a deposit of only $350,000 (less than 2.5% of the cash required to effect the purchase), SSVR elected to relinquish direct control of Jay Peak to Quiros and Stenger, apparently without any written letter of intent or other agreement, and without Quiros providing any demonstration that he had the resources to effect such a purchase.

13. SSVR and Q Resorts signed the stock transfer agreement on June 13, 2008, which resulted in a closing 10 days later, on June 23, 2008. The purchase price was $25.7 million, $8.5 million of which was assumed debt.

14. Prior to and in preparation for the closing with SSVR, Stenger, acting for SSVR, opened brokerage accounts at a Miami area office of Raymond, managed by his former son-in-law, Joel Burstein. Stenger opened an account in the name of Phase I on May 20, 2008, and a second account in the name of Phase II, one month later on June 20, 2008.

15. On June 16 and 17, 2008, Stenger, acting for SSVR, transferred $11 million of Phase I investor funds from an escrow account at People's United Bank ("Peoples Bank") in Vermont to the SSVR Raymond James account in Florida.

16. Three days later, on June 20, 2008, Stenger, still acting for SSVR, transferred $7 million of Phase II investor funds from People's Bank to the SSVR Raymond James account. These transfers directly violated the express terms of the Escrow Agreements between Peoples and the EB-5 investors.

17. Simultaneously, Counsel for SSVR communicated with Burstein, with copies to Quiros, Stenger and others, suggesting that the transferred funds should not be used to effect the Jay Peak purchase (See attached Exhibits "1" and "2").

18. Notwithstanding these communications, it is evident that Stenger, acting on behalf of SSVR, had consciously permitted $18 million of escrowed EB-5 investor funds to be turned over to Quiros just before his acquisition of the ski resort **for no known purpose**.

19. Quiros' testimony at his deposition taken by the SEC on May 22, 2014 is compelling:

> *A What we made them do at the time of closing, I didn't believe that they had these funds in these accounts. I didn't believe it. Bill Stenger told me. Other men also told me. But I didn't believe it. I said the only way that I'm going to be able to believe you, you're going to have to open up your own account at Raymond James.*
>
> *Q And this is what you told MSSI?*
>
> *A So they proceeded and opened up – Louis Dufour, Louis Four (sic), Bill Stenger, at that time, Bill Stenger was still on MSSI's team, you guys open up the account at Raymond James and show me, prove to me that these funds are here. So I waited. They opened up the account at Raymond James. So I never used this account. I told them I'm not going to use this account.*

20. On June 23, 2008, the day of the closing, Quiros took $7.6 million from the Phase I investor account and $6 million from the Phase II investor account at Raymond James,

10

and placed the funds in his Q Resorts, Inc. account there. He then wired $13.5 million from that account to SSVR. Stenger then closed the limited partnership accounts at Raymond James.

21. The balance of $5.5 million owed to SSVR, was transferred over the next two months, the additional monies also coming from Phase I and Phase II investor monies. Thus, there is no real dispute that the funds tendered to SSVR to effect the stock transfer all came from the Phase I and II investor monies and are fraudulently/wrongfully converted monies investor funds.

22. The Stock Transfer Agreement ("STA") was signed on June 13, 2008 by SSVR and Q Resorts for a closing to take place 10 days later on June 23, 2008 (See attached Exhibit "3"). There was no lender involved in the transaction, and the STA indicates that Quiros was not required to provide a financial statement to SSVR, or otherwise demonstrate his source of funds to accomplish the purchase.

23. The 44 page agreement, with numerous schedules attached, indicates a total purchase price of $23.5 million, $15 million cash at closing, the assumption of $8.5 million of pre-existing debt and an additional adjustment of $2,512,065, which SSVR had advanced to finance operations during the 6 months prior to closing when Quiros managed the ski resort. Q Resorts received credits at closing for the deposit of $350,000, $401,000 in accrued "interest" and $301,000 for purported "profits" earned during the same 6 month period.

24. Several provisions of the agreement bear mentioning. Article 1 is entitled Definitions, and has two key provisions, the first being Article 1.1(q), defining "EB-5 Project" to

include the Phase I and the Phase II projects, and the obligations and liabilities associated with the limited and general partnerships for both.

25. The second key definition is Article 1.1(gg), defining the term, "Knowledge of the Transferors", defined to include the knowledge, "after due inquiry of Louis Dufour ("Dufour") and Louis Herbert ("Herbert"), as well as the knowledge of William Stenger", but only to the extent that his knowledge was communicated to the others in writing prior to the execution of the agreement.

26. However, "knowledge of a particular fact" is when:

> (ii) an individual is actually aware of such fact or other matter; or
>
> (ii) a prudent individual could reasonably be expected to discover or otherwise become aware of such fact, or other matter, in the course of conducting a reasonably comprehensive, but not exhaustive, investigation concerning the existence of such fact or other matter.

27. Other key provisions include Articles 3 and 4, entitled REPRESENTATIONS AND WARRANTIES, wherein the Seller, but not the Buyer was required to provide to the other party a financial statement, and Article 4.6, where the Buyer promises that it "has or will have" the funds necessary to complete the transaction on the June 23 scheduled closing date.

28. On May 20, 2015 Dufour and Hebert, on behalf of SSVR, provided to the SEC a Declaration under the pains and penalties of perjury (See attached Exhibit "3"). The document recites a short history of the Q Resorts purchase, tacitly admits that funds held by the Phase I limited partnership were transferred to the control and custody of Quiros prior to the closing, but also incorrectly suggests that the Phase II offering was outside of the purchase.

29. This statement is both inconsistent with the express terms of the STA, and also ignores that SSVR had solicited, escrowed, and then transferred to Quiros over $7 million of escrowed Phase I prior to the closing. The Declaration also fails to mention that Stenger, while still employed by SSVR, had signature authority over all escrowed EB-5 monies, and acting in his dual capacities, authorized the wire transfers to Raymond James prior to the closing.

30. As the consequence of the conscious actions of SSVR and its principals, Quiros was able to affect the purchase of the Resort, using solely the funds of the Phase I and Phase II limited partnerships. SSVR took those funds, knowing the source, and upon information and belief, as of the date of this filing still retains them. The Plaintiffs, by this action, seek the return of those funds to be paid to the Receivership estate or to the Phase I and Phase II investors.

## COUNT ONE
## AIDING AND ABETTING COMMON LAW FRAUD

31. The Plaintiffs re-allege and repeat the allegations contained in Paragraphs 1 to 30 as if stated herein.

32. The Defendant had actual knowledge of Quiros plan and scheme to use escrowed funds of the Phase I and Phase II limited partnerships to effect the purchase of the Resort.

33. Notwithstanding such knowledge, the Defendant, took affirmative steps to assist Quiros in carrying out his plan. Such actions include, but are not limited to the following:

    a. Taking no action to obtain knowledge of the source of Quiros source of funds for the purchase of the Resort;

  b. Taking conscious and affirmative steps to release escrowed funds and transfer them into the custody and control of Quiros prior to and separate from the closing on the purchase of the Resort;

  c. Taking receipt of the previously escrowed funds when it knew that such monies were the property of the investors in Phase I and Phase II and not an asset of the Resort;

  d. Absconding with such funds and removing them from the U.S. in order to defeat the investors' right and opportunity to recover such funds.

34. The acts and/or omissions of the Defendant were carried out in order to assist Quiros with his illegal and improper plan.

## COUNT TWO
## CONVERSION

35. The Plaintiffs re-allege and repeat the allegations contained in Paragraphs 1 to 34 as if stated herein.

36. The Defendant, by its officers, agents and/or employees, had possession, custody and control of escrowed funds of the Phase I and Phase II limited partnerships.

37. The Defendant took the escrowed funds and transferred such funds to the custody, control of Quiros with knowledge that Quiros would use the funds to make payment for the purchase of the resort, thereby transferring the funds out of escrow and into the unfettered custody and control of the Defendant.

38. The conduct of the Defendant was knowingly carried out in order to convert said funds to an improper and illegal use.

## COUNT THREE
## BREACH OF FIDUCIARY DUTY

14

39. The Plaintiffs re-allege and repeat the allegations contained in Paragraphs 1 to 38 as if stated herein.

40. The Defendant created a plan to raise funds for development of the Resort by creating limited partnerships and soliciting monies through the federal EB-5 visa program.

41. The Defendant created limited partnerships and made offerings to potential investors with explicit representations that investor funds would be safely held in escrow until such time and the funds would be used for development of the Resort.

42. The Defendant, in taking receipt of such funds, creating limited partnerships and establishing escrow accounts to hold such funds, had a fiduciary duty to maintain and control such funds until they could be utilized according to the investors' expectations.

43. The Defendant breach its fiduciary duty as follows:
    a. Taking conscious and affirmative steps to release escrowed funds and transfer them into the custody and control of Quiros prior to and separate from the closing on the purchase of the Resort;
    b. Taking receipt of the previously escrowed funds when it knew that such monies were the property of the investors in Phase I and Phase II;
    c. Absconding with such funds and removing them from the U.S. in order to defeat the investors' right and opportunity to recover such funds.

## COUNT FOUR
## UNJUST ENRICHMENT

44. The Plaintiffs re-allege and repeat the allegations contained in Paragraphs 1 to 43 as if stated herein.

45. The limited partners of Phase I and Phase II conferred a benefit on SSVR by tendering investment monies to them.

46. SSVR knowingly relinquished control of the investor funds to Quiros in order to receive the funds back in payment for the sale of Jay Peak to Quiros.

47. Under such circumstances, it would be inequitable and improper for SSVR to retain the benefit of such a transfer.

## COUNT FIVE
## VIOLATION OF VERMONT FRAUDULENT TRANSFER STATUTE
## (9 V.S.A. § 2288)

48. The Plaintiff re-alleges and repeats the allegations contained in Paragraphs 1 to 47 as if stated herein.

49. The Defendant, its agents, officers and/or employees were acting in a capacity as debtors with respect to the investors who were their creditors to the extent of the investments made in the limited partnerships.

50. The Defendant transferred the funds of the investors with the actual intent to defraud the investors, which was in violation of 9 V.S.A. § 2288(a)(1).

51. The Defendant holds or held such funds in violation of the statute, and must disgorge such funds and return them to the Plaintiff in his capacity as Receiver.

**WHEREFORE**, the Plaintiff requests this Court do as follows:

    a) Adjudge and decree that Defendant has engaged in the conduct alleged herein;

    b) Order the transfer of all Phase I and Phase II investor funds back to those individual investors.

    c) Enter judgment against Defendant for their damages plus interest, costs and attorneys' fees; and

d) Grant such other relief as this Court deems necessary and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL POSSIBLE ISSUES.**

For the Plaintiffs,
And the Phase I and II Investors
By their Attorney,

Joshua L. Simonds, Esq
The Burlington Law Practice, PLLC
2 Church St. Suite 2G
Burlington VT 05401
jls@burlingtonlawpractice.com

_____
Keith L. Miller
*Pro Hac Vice Pending*
Mass. Bar Reg. No. 347280
New York Bar Reg. No.
Fifty-Eight Winter Street, 4th Floor
Boston, MA 02108
(617) 523-5803